[Crim. No. 3449. In Bank.—November 30, 1931.]

THE PEOPLE, Respondent, v. MAY OTIS BLACKBURN, Appellant.

Thomas Wade Cochran and Henry M. Lee for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, Buron Fitts, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

SEAWELL, J.—The opinion of the District Court of Appeal, Second District, Division One, by Conrey, P. J., is hereby adopted and forms a part of the opinion and decision of this court. Said opinion reads:

"By information containing twelve separate counts defendant was charged with the crime of grand theft, committed at various times, of which the first date is July 1, 1927, and the latest is October 28, 1928. While the case was on trial counts 6 and 7 were dismissed by the court. On counts 4 and 12 there was a verdict of not guilty. The convictions are on the remaining eight counts. The defendant appeals from the judgment of conviction, and from an order denying her motion for a new trial.

"The first count of the information charges that on July 1, 1927, the defendant unlawfully took away $2,700 of the personal property of one Clifford R. Dabney. (The other counts on which the defendant was convicted are of like tenor except as to dates and amounts of money taken.)

"According to the testimony of the witness Dabney, he became acquainted with the defendant at the city of Los Angeles about December 1, 1924. Between that time and the times of the several payments of money made by him to

the defendant, sundry representations of fact were made to him by the defendant in a series of conversations. In those conversations she informed him that she had written a book entitled 'The Great Sixth Seal', or 'The Lamb's Book of Life'; that this book contained various mysteries of science and secrets of life and death; the secret of how to raise the dead; the secret of locating gold and precious jewels and all the hidden treasures of the earth; that it contained the lost measurements of Solomon and Noah, by which all precious minerals of the earth could be located; that it contained the secret of radioing from planet to planet and from this earth to other planets; that she and her daughter Ruth Wieland knew all these secrets and that they had been revealed to her by the angel Gabriel and the angel Michael; that the work would be finished in February, 1925, and that it took a certain amount of money, around $5,000 to get everything in readiness so that the Sixth Seal could be printed. There are many further details of these representations, which we need not set forth at length. The witness testified that the defendant asked him for money to complete this work and that he gave her sums of money, varying in amounts, over an extended period of time; that in contributing these moneys he had relied upon and believed these various representations made to him by the defendant; that from time to time she had set the dates when 'The Great Sixth Seal' would be completed, but they did not come about and defendant represented that this would require more time and would require more money; that he gave the defendant $2,700 on the first day of July, 1927; that he was commanded to pay the money 'to make a concord' for Bessie Mosier; that 'Bessie Mosier was to make a concord, which concord was to be the finished concord before another date was set for the finished work, for everything to come about—for another date to be set so everything could come about so the Sixth Seal could be published'. Other witnesses testified to similar representations made by the defendant, and payments made by said Clifford R. Dabney to the defendant, as well as payments of money made by some of said witnesses to the defendant. Evidence was introduced showing that said book, The Great Sixth Seal, was never published. Other circumstances were shown in evidence, from which an inference

might fairly be drawn not only that the representations made by the defendant to the plaintiff were untrue, but also that in fact she knew that they were untrue, and that she knowingly made such false representations for the purpose of imposing upon the credulity of Dabney in order to obtain his money.

"During the progress of these affairs an association of the followers of the defendant was formed, under the name of The Divine Order of the Royal Arms of the Great Eleven; during the year 1926 land was purchased at a place referred to as the Santa Susanna hills, in Ventura county; buildings were erected, and the association established there a community home occupied by the members of the order. A considerable amount of the money furnished by Dabney went into the improvement of this property and for other expenses of the community. It was the theory of the defendant, in support of which she introduced evidence, that the defendant in good faith was establishing two religious societies ('The Divine Order of the Royal Arms of the Great Eleven' and 'The Church of the Divine Science of Joshua, the Branch, the Headstone of the Corner'), of which Dabney and others became members, and that the moneys paid by Dabney were merely contributions to the funds of these associations in which the defendant and said Dabney and the other members of the societies were alike and in good faith believers.

"The grounds of appeal on which appellant relies are stated in seventeen propositions. We shall use the numbers as given in the brief for appellant, but shall consider them in a different order.

"*Point XVIII.* That the verdict is not supported by the evidence. The evidence is sufficient to sustain the verdict of conviction on each of the several counts. The representations made, and Dabney's reliance thereon in paying money to defendant, are not seriously controverted facts. The real defense was that defendant in good faith believed in those representations, and did not make them with intent to deceive and defraud. The jury having determined that branch of the inquiry against defendant, and there being evidence of a substantial nature to justify that decision, the conviction must be sustained unless there were, in the

trial, prejudicial errors which deprived defendant of a fair trial and so caused a miscarriage of justice.

■ *"Point XXI.* That the offenses were not proved to have been committed within the county of Los Angeles. This contention is without merit. (Pen. Code, sec. 781; *People* v. *Bocchio,* 80 Cal. App. 138, 144 [251 Pac. 672].)

■ *"Points II to XV.* These are assignments of error by the court in refusing to give the jury instructions requested by the defendant. In the brief of appellant, these several refused instructions are referred to by description, without quotation of them and (except under point II), without stating where they may be found in the record. In only two instances (points II and III) is it asserted that the law on the same subject was not properly covered in other instructions which were given to the jury. Therefore, we shall assume that these matters were so covered, by correct statements of law in the instructions given to the jury. This assumption is reenforced by the facts concerning these instructions as set forth in the brief for respondent, and also by the fact that on reading the entire record of instructions given they appear to constitute a very complete and fair statement of the law applicable to the case.

■ "As to points II and III it is asserted by appellant that the court did not in its other instructions give any correct statement of the law on the subjects of those instructions. The requested instruction discussed under point II is shown at page 78 of the clerk's transcript. The same language, with unimportant variations, was used in other instructions given to the jury. (Clerk's Transcript, pp. 99 and 109.)

"The requested instruction discussed under point III reads as follows:

" 'Evidence has been offered tending to prove that the money or property contributed by the complaining witnesses was used to pay living expenses of the various members of the so-called Divine Order Of The Royal Arms Of The Great Eleven, including the personal expenses of the complaining witnesses as members thereof. You are instructed that if you find this to be a fact and that such money or property was not used to enrich the defendant or diverted to her personal gain, you are to consider such facts in determining whether or not there was an intent to defraud

the complaining witnesses on the part of defendant and if you further find that the complaining witnesses knew the purpose for which their contributions were to be used and that they were actually used for that purpose, then no offense is shown to have been committed and it will be your duty to find the defendant not guilty as to each and every count of the information.' We are of the opinion that this requested instruction is correct, and in view of the evidence referred to therein the defendant was entitled to have such instruction given to the jury. It follows that the refusal of the court to give this instruction was an error, unless an equivalent of the requested instruction was given. Appellant asserts that this was not done. In reply the attorney-general has quoted certain instructions given, but they do not appear to give the defendant the full benefit of the rule stated in the requested instruction.

    "*Point XVI.* That the court erred in permitting the introduction of evidence of a conversation between the defendant and one Eleanor Sandrosky, concerning one Sammy Rizzio. Mrs. Sandrosky testified that she and her husband conducted a drug store in the city of Los Angeles; that in July, 1924, the defendant came to her drug store and asked her to come to Mrs. Blackburn's residence in Los Angeles; that the witness complied with this request; that the defendant at her residence had a large number of manuscripts which she said were a part of the Great Sixth Seal. Among other things the witness said: 'She told me to raise my right hand and repeat after her, "I swear to the living God and by all that is holy and the Holy Ghost that I will not reveal what is told me," so I did. Then Mrs. Blackburn stated, she says, "Now, prepare yourself, as this is going to be terrible." She says, "The angel commanded that I kill Sammy Rizzio and you supply me with poison." ' The testimony further shows that Rizzio was the husband of Ruth Wieland, the defendant's daughter. The witness further testified that in the month of August, 1924, and at the same place, the defendant renewed her request for a poison and told her 'To be sure it is the real thing.' The witness said that she did not give Mrs. Blackburn any poison, but gave her some colored water. 'Q. When was the date of the last conversation you had with Mrs. Blackburn about Sammy Rizzio? A. It was on a Sunday, the last time I

ever seen Sammy Rizzio. Q. That was the last time you ever saw him? A. Yes, sir. The first Sunday in August of 1924.'

"It will be noted that these conversations with the druggist took place several months before defendant became acquainted with Clifford R. Dabney. In so far as this evidence related to the proposed use of poison, we agree with counsel for appellant when in his brief he says: 'It was not germane to any issue in this case; did not tend to prove or disprove any material issues; it was not shown to have ever been connected in any way with the complaining witness, Clifford R. Dabney, or that he ever heard or knew of any such conversation; it was far too remote to have had any causal connection with any act or omission of the defendant May Otis Blackburn in the summer of 1927, three years later, that was the cause or a cause of the complaining witness' parting with any money or property, it did not constitute a representation and was clearly incompetent for any purpose in the case on trial.'

"It is urged by respondent that the objections made to the admission of the foregoing testimony with reference to poison to be used to bring about the death of Rizzio, were not made in sufficient form or substance to authorize appellant now to complain of the admission of such testimony. We have examined the objections and the rulings thereon, and we think that they were sufficient and were made at a proper time to advise the court of the objections and the grounds thereof.

"*Point XVII.* One W. P. Rhoades was among the followers of defendant and with him was his daughter, Willa Rhoades, a sixteen-year-old girl. This daughter died on the first day of January, 1925, at the home of Rhoades in Los Angeles. He testified that the defendant instructed him to prepare the body and to keep it for the resurrection, and that in accordance with these instructions the body was kept in salt packs and ice. Again the witness said: 'Q. Did she say that she was going to raise the body? A. Well, if I remember right she said she could.' And further on he said: 'Q. Well, she never at any time stated to you that she then had the power to raise the dead or resurrect the dead, did she? A. No. Q. But she did state that after the Passover and the resurrection that they would then

be able to raise the dead; is that what she said? A. Yes, sir.' It was further shown by the evidence that after fourteen months the body was finally buried in a cemetery and that surrounding it the bodies of seven dogs were buried; that said dogs were to have some part in the work of resurrection. It is not denied that sufficient and timely objections were made to the testimony concerning these transactions. The death of Miss Rhoades occurred at a date near the time when Dabney first became acquainted with the defendant, but there is no evidence that the statements made by the defendant concerning Miss Rhoades were made to Dabney, or in his presence, or that he ever heard of them. Dabney testified that he did not know when Willa Rhoades died or what was done with her body after her death, and that he could not remember that he had ever had any conversation with the defendant concerning the body of that young woman. All of the testimony on that subject was improperly admitted.

"The issue concerning the guilt or innocence of the defendant of the crime of grand larceny in obtaining said sums of money from Dabney, and appellant's defense thereto, turned largely upon the question of good faith and actual belief of the defendant in the truth of the representations made to Dabney, and which induced Dabney to pay over the money. There was substantial evidence in favor of the prosecution, but also there was substantial evidence in favor of the defendant upon that issue. Under this condition of the case it becomes clear that the evidence in relation to Rizzio, and concerning the death of Miss Rhoades and the subsequent transactions in that connection, was extremely prejudicial to the defendant. There is a reasonable probability that without the creation of such prejudice in the minds of the jury as was likely to be created by this evidence, the jury would not have been satisfied beyond a reasonable doubt that the defendant was guilty of willful fraud and deception in making the representations to Dabney upon which he relied in paying money to defendant. It matters not how absurd the faith of the defendant and her followers may seem to be, if in good faith she believed in the cult or creed upon which she was founding this new society, and in the truth of the said representations. Defendant had the same right to organize a society based

upon that faith, that her followers had to join with her in creating the society and establishing the community, provided only that they did not conspire together for some purpose prohibited by law. And if for the purposes of such society they chose to invest their money, that was no crime against the state. In presenting her defense to the charge that by wilfully false representations she had obtained the moneys received by her from Clifford R. Dabney, the defendant was entitled to the benefit of an unprejudiced jury. Such right is not secure, where evidence tending to degrade the defendant but not tending to prove the facts relied upon to establish her guilt, has been placed before the jury. And when, as here, it is reasonably probable that the erroneous admission of evidence has created a prejudice which led to a verdict which otherwise might not have been rendered, the judgment of conviction should not be allowed to stand.''

The case in many of its features is a most unusual one. The defendant was charged in general language with the crime of grand theft. The specific acts, however, upon which the prosecution relied, and upon which the convictions were obtained, consisted of various acts of false representations as to the use the defendant was to make of moneys furnished by the complaining witness Dabney in promoting a cult, if it may be so called, of which defendant was the founder and ruling power and the complaining witness Dabney had been a zealous devotee and understudy of said defendant for approximately four and a half years. In fact he had served as the president of the organization and was at all times during said period active in promoting its temporal and spiritual welfare. In general business affairs he was experienced and successful, and had become affluent. His wife was in hearty and active co-operation and accord with him in the financial assistance which he rendered the defendant to the end that she might bring to pass the things which passed all understanding.

The evidence introduced by the prosecution took a wide range embracing within its scope the claims of the defendant (as asserted by the prosecution's witnesses), that she was an ambassador of the Lord invested with divine power. The claim of the prosecution is and must be that she was a mere pretender, an impostor, and knew that she possessed

no such power. If she was misguided in her professions of power, but in fact actually believed that she possessed it, she would not be amenable to the criminal law, but her case would be psychopathic in form. Her mental status, however, is one of fact which the jury and not the court may adjudge.

Criminal statutes which prescribe punishment for false representations primarily were intended to protect persons against those who report falsely with respect to their earthly and material possessions. Any legislative attempt to limit or regulate persons in their claims to the possession of exceptional spiritual power or knowledge would be rejected as a dangerous invasion of the state into the realm of religious freedom and privilege, which, from the beginning of our government, has been guarded by constitutional barriers. The framers of our criminal statutes had in mind material affairs and not spiritual matters nor the punishment of persons who claim or represent themselves, by divine favor, to be endowed with supernatural power, unless the intent to defraud is discernible in the pretense as to the possession of supernatural powers. This power in the instant case, according to the prosecution's evidence, was claimed by defendant to be derived from God agreeable with His written word as recorded in Holy Scripture. That book is an open record and all who will may solve for themselves the extent or degree of divine power that mortals may hope to attain. Each person is at liberty to interpret it for himself. That a mere pretender who wittingly and fraudulently imposes upon the credulity of the weak in mind to their financial loss, is guilty of fraud, there can be no doubt. Persons mentally healthy will not be so imposed upon. In the instant case no claim is made of a weakening of mentality on the part of those who accepted the defendant in the role she manifested herself, but they meticulously relate her claim of omniscient power, even sufficient to resurrect the dead, and her claim of knowledge of and power over, all phenomena of nature and all the wealth that heaven and earth contain. The complaining witness and others of defendant's disciples testified that they had absolute faith in her powers to accomplish the things she pretended to have been empowered to do. Running through the case there appears a vast amount of evidence as to what

the defendant in an elaborate, but incongruous undertaking, hoped and promised to do. The whole plan of life and salvation is a babel of incoherency abounding in absurdities of an extreme type and the wonder is that rational minds should have become obsessed by such chimerical delusions.

The crux of the People's case did not consist in asserted spiritual power or promises of a spiritual nature, although such matters occupy a large portion of the record, but consists in the promise of a material matter, to wit "The Great Sixth Seal", or "The Lamb's Book of Life", a book of many pages, had been written by the defendant and her daughter under angelic dictation; that the labor of taking the dictation had been a most intensive task, continuing day and night through a series of years; that defendant had obtained several thousands of dollars from the complaining witness for the express purpose of printing said book, but that she had failed to fulfill her promise. Said complaining witness had had many conferences with defendant as to what the book was to contain and among other things he was told that it explained the mysteries of science and the secrets of life; the secrets of resurrecting the dead; the secret of locating gold and precious jewels and all hidden treasures of the earth; restored lost measurements of Solomon and Noah by which all precious minerals could be located and it contained the secret of radioing from planet to planet. Said complaining witness testified that he was told by the defendant that all of the above secrets had been revealed to them by Angels Gabriel and Michael. The failure to publish and print the book as described by the complaining witness constitutes the main grounds of the prosecution. It is true moneys had been advanced for buildings and maintaining a colony or community and to meet incidental expenses generally, but the interest of the complaining witness centered in the completion and printing of "The Great Sixth Seal" or "The Lamb's Book of Life". It was, he professed to believe, the key of entry into the arcanum of all knowledge and the paltry dollars which he had expended in its promotion were as trifles compared with its priceless gifts. What its market or commercial value would have been if published, is another question.

We have set forth but briefly disclosures of the record before us, and in our investigation we have been unable

to see what relevancy the gruesome story of the preservation of the body of Willa Rhoades, in the promise of resurrection, could have borne to the issue of whether or not the defendant applied the moneys which she received from the complaining witness to the purposes for which they were procured. The same lack of relevancy exists in the admission of evidence directed to the alleged attempt of the defendant to administer poison to one Sammy Rizzio. We feel, as did the District Court of Appeal, that the evidence as to both of the events above adverted to, must have prejudiced the defendant in the minds of the jury to the extent that the testimony offered in her defense could not have received the deliberate consideration that the law accords to all persons charged with crime. All other matters of importance have been properly disposed of in the decision of said District Court of Appeal.

The judgment and order are reversed.

Richards, J., Preston, J., Shenk, J., Curtis, J., Langdon, J., and Waste, C. J., concurred.